### KERR v. SOUTHWICK.

(Circuit Court, D. Connecticut. May 25, 1901.)

No. 1,017.

PATENTS—AGREEMENT FOR LICENSE—OPERATION AND EFFECT.

Evidence considered in relation to the signing of a memorandum reciting the terms on which complainant was to grant defendant a license to sell a patented article, and *held* to show that such memorandum was not intended by the parties to operate as a license in itself, and was not effective as such, but was valid as an agreement which entitled defendant to obtain a license on the terms therein stated, and on his compliance with the further oral agreement of the parties.

In Equity.

Henry D. Williams, for complainant.

John S. Seymour and John J. Walsh, for defendant.

TOWNSEND, District Judge. Bill for cancellation of the following paper, and for general relief:

"Memorandum of Agreement between Kerr & Company and G. W. Southwick.

"In consideration of the payment by G. W. Southwick of five per cent. to the said Kerr on the gross cash receipts of wire belt lacing sold by the said Southwick, the said Kerr will grant to the said Southwick license to sell and use wire belt lacing in any part of the United States under patent No. 456,993, now owned by the said Kerr. And it is understood and agreed that the sale of said wire belt lacing sold by the said Southwick, his agents or representatives, is to carry licenses to use it as prescribed in said patent to the purchaser of said wire belt lacing. And it is further agreed by the said Kerr that he will at all times use his best efforts to prevent any one from using the belt fastener described, illustrated, and claimed in his patent, No. 456,993, with any lacing wire other than that made by said Kerr or sold by said Southwick. It is also agreed between the parties that, if it is mutually agreed to bring suit against any one to maintain the validity of said patent, the said Southwick will pay such portion of the expenses as may be agreed upon between the parties at the time. If, through any verdict or decision of the court, the patent in suit is made invalid, this agreement is annulled. Any notices issued by the said Kerr, his agents or representatives, in relation to the decision of the courts or decree of injunction against the said G. W. Southwick and Company, will contain mention that the said Southwick is licensed to sell wire belt lacing and make fasteners as prescribed by the patent in suit. It is agreed between the parties that they will maintain a standard price on wire belt lacing, and that the limit of discount will be fifty per cent. off list price of $2.00 per hundred feet. And the said Southwick agrees to purchase the wire belt lacing from the said Kerr. The price on the same is not to exceed twenty-four cents per pound in fifty-foot coils, the end of each securely tied; and the said Kerr agrees to keep the quality of said wire fully up to the standard, and to fill all orders from the said Southwick for wire belt lacing promptly. Any failure on the part of said Kerr to furnish the said Southwick with wire belt lacing, or if at any time the quality is not up to the standard, the said Southwick has a right to purchase wire for the purpose elsewhere.

"Approved and agreed by the parties this 3—27—1897.

"Hugh Kerr.
"George W. Southwick."

The complainant, Hugh Kerr, Sr., is the owner of patent No. 456,-993, issued August 4, 1891, for a belt fastener produced by lacing the abutting ends of the belt with wire. It provides an excellent joint or fastening, is used almost universally on narrow belts, and is of great commercial value. The defendant, prior to 1896, had infringed said patent. Complainant brought two suits against him for said infringement. While the second suit was pending, and after testimony taken, the parties entered into negotiations for a settlement, in the course of which the above memorandum was signed. The defendant continued the sale of the patented lace, but has never paid any royalties. The complainant, at the date of these transactions, was 70 years of age, and in feeble health. The defendant was about 46 years old. On March 27, 1897, complainant and defendant had been negotiating in the office of complainant's counsel, Gen. Marble, and a decree for a permanent injunction and the payment of $300

by the defendant to the complainant had been agreed to. The terms
of the formal license had been much discussed. While in Gen.
Marble's office, defendant went into the room where a stenographer
was at work, and dictated a memorandum, which was drawn up in
duplicate. Complainant and defendant went down the elevator to-
gether. Complainant's version of what then occurred is as follows:

"A. 15. We talked just about the same as we did before, discussing the
stipulations of the form of license that Gen. Marble had drawn up. The
conversation was kept up till well along in the afternoon. We could not
come to any terms of settlement. I then got up, and went towards the
elevator, to go home. Mr. Southwick followed me into the elevator, and
we went down together. When we landed on the lower floor, Mr. Southwick
asked me to wait for a minute; he wanted to show me something. He
then took out of his pocket two copies of a memorandum that he had, which
he thought would form the basis of the settlement of this matter, and which
he asked me to put my name on one. He had his name on the other. I
had never seen them before. I made the remark that that was not a license.
He said, 'No, but it is something that we can form a license on,'—on the
general terms of the memorandum,—as he told me he said he was going
away on a trip the following week, and he wanted to take this with him
to show to his customers that I intended giving him a license, and that when
he came back the license could be made up from that: and that we could
do it without going to General Marble's office to do it, as he was afraid,
or that he did not wish Mr. Marble to send him in a bill; that he did not
propose to pay him one cent. He then asked me to put my name on the
other copy; that all he required of it was to have something to show that
he would get a license. After putting my name to the paper, Mr. South-
wick and I came out on Broadway, and walked up as far, I believe, as
Chambers street. Before going away, he said he would be in New York
the beginning of the week, and that he would have this fixed up,—meaning
the license."

The defendant's version is as follows:

"A. 58. We went down in the elevator together to the ground floor. On
reaching the ground floor, we walked over to the telegraph station, and
stood there, at which time I handed Mr. Kerr one of these copies that I
had written in Mr. Marble's office, and asked him to read it over, and see
if it was all right. He read it over carefully, and said, 'Yes, that is what
we have agreed to.' I then asked him to sign the papers, and I would do
so, that we might each have a copy of what had been agreed to in relation
to settling this suit, so that there could be no mistake as to these stipulations
when the license was to be drawn by Mr. Marble. He signed the paper I
handed him, and handed it back to me, keeping the one I had signed and
handed to him, and together we went out of the building."

Two days after the signing of said memorandum, defendant signed
a consent for the issuance of a decree for an injunction, which was
duly entered. Two days later, defendant called, and paid $300, which
complainant claims was in settlement for past infringements. On
the preceding day defendant had ordered a quantity of lacing, which
was delivered to him at various times during the 11 months next fol-
lowing. Defendant paid complainant $1.20 for the first delivery,
which was billed at the rate of 24 cents per pound, as provided in
said memorandum. Complainant claims that all later deliveries were
billed at regular trade rates. On April 29th—about a month after
said memorandum was signed—defendant accepted service of the
decree for injunction. On said day complainant wrote two letters
to W. H. Salisbury & Co., in the first of which, at the dictation of
defendant, he stated "that by agreement Southwick & Co. are licensed

to sell wire lacing under my patent"; while in the second he wrote, at the dictation of his daughter, that "the statement in' the letter written to you this morning * * * ought to have read that we were negotiating with Mr. Southwick to grant him license, which, I presume, will be consummated in due time." Complainant claims that thereafter he was constantly trying to get defendant to execute a license as agreed, and that, after said first delivery, he always treated defendant as a purchaser or infringer. Complainant further claims that the words "and agreed by the parties this" were written' into said memorandum by defendant after signing, and that the receipt for said $300 payment also was altered by defendant's adding to the words originally written, "In full settlement of suit Kerr vs. George W. Southwick & Co.," the words, "and for protection to business by license."

The elaborate and finished explanations by defendant of the various inconsistencies in his conduct are met by flat contradictions or strong improbabilities. When complainant testified that bills were repeatedly sent to defendant at dealers' rates, he testified that no bills were ever received. When it appeared necessary to prove calls on plaintiff, he fixed the dates of calls at new offices rented by plaintiff before plaintiff had begun his occupancy thereof. After complainant had caused the concluding portion of above memorandum to be photographed in order to introduce expert testimony thereon, defendant changed his testimony. The sharp contrast between the story told in the answer and that told on the witness stand, and the whole course of dealings between the parties, support the contention that defendant has taken an unfair advantage of the infirmities of complainant. On the other hand, the memorandum does not widely differ from the proposed terms of settlement then under discussion. It was at least approved by complainant when signed. The complainant made one small sale, and accepted payment therefor in accordance with said agreement; he accepted the $300; he took his decree of injunction; he stated that defendant was licensed; he wrote defendant, urging him to prosecute or look out for infringers, as provided for in said agreement; and, finally, although he claimed as early as the second Salisbury letter on April 29, 1897, that defendant was not a licensee, and thereafter notified the trade that he was an infringer, he did not file this bill for cancellation until November 28, 1899. The attempted explanations of this delay are insufficient. That it was understood that a formal license, containing the usual stipulations on the part of the licensee, remained to be executed before the transaction could be considered as finally completed, appears from the following testimony: In addition to his statement already quoted, referring to a license "to be drawn by Mr. Marble," defendant states that plaintiff, on April 29, 1897, said that Mr. Marble would proceed now to draw up the license, and that plaintiff "said it would be ready before the expiration of the first three months, and I told him, of course, I would expect to receive it before that time, and before any payments of royalties were made," and that "he had never refused to Hugh Kerr to sign a formal license." Also, on his direct ex-

amination, being asked, "Did you or not understand that there was anything further for you to do in order that the suit would be effectually settled, and you licensed under this patent?" defendant answered, "Nothing whatever, except possibly to sign a license when it was formally presented to me." And, being next inquired of by his counsel, "And did you or not understand that you were to sign the license?" he answered: "I never understood it was necessary for me to sign a license to consummate this arrangement. * * * The formal license was to be drawn up by Mr. Marble in accordance with the memorandum that Mr. Kerr and I both had after the decree then had been issued and recorded. It was to be signed by Mr. Kerr, and sent to me as the formal license." Mary Kerr testified that the letter of June 30th, calling for matters to be arranged at once, referred to the signature of a proper license that Gen. Marble had; that her father had told Southwick that Gen. Marble had a license for him to sign; that Southwick, on November 23, 1897, referred to the memorandum, and wanted to sign the original license; and complainant testified that he believed the license was completed, ready for Southwick's signature and his, and he did not know why it was not signed; that Mr. Marble had the license ready for him to sign within a week of March 27, 1897. Gen. Marble drew two formal agreements for license containing the usual provisions for the protection of the patentee. One of them contains an agreement as to the purchase and sale of the material at 24 cents per pound; the other one omits it. Gen. Marble's statement is that it was this agreement as to the purchase of material which defendant objected to, and that, therefore, he drew another, both of them remaining in his office unsigned. On the whole evidence it seems reasonably certain that, when defendant induced complainant to sign the memorandum, defendant knew that complainant did not consider it as a license, and that, if complainant had known or believed that it could be so treated, he would not have signed it. Also that defendant intended to use the memorandum as a license if he had occasion so to do. Both parties agree that the formal license drawn up by Gen. Marble should have been executed, and it seems more probable that the failure to execute it is through the fault of defendant. The memorandum ought not to be canceled, for it is defendant's evidence of an agreement for a license, which he was at the time certainly, and perhaps hereafter may be, entitled to have executed. But plaintiff is entitled to an injunction against defendant's representing that he has a license. Defendant, before representing that he had a license, should at least have made a formal offer to execute it upon his part. He should also have tendered the royalties at the expiration of the first three months. Defendant claims that complainant has broken his agreement by advertising the injunction without including the fact of the license. Until defendant had executed or offered to execute the proper agreements upon his part, contained in the formal license drawn by Gen. Marble, complainant was not bound to deliver the license. A decree may be entered in accordance with this opinion.